ALINE E. CRANE et al., respondents,

*v.*

DELPHINE McMURTRIE et al., appellants.

[Submitted April 4th, 1910. Decided November 14th, 1910.]

1. It is an established rule of construction that the words of a private grant, if equally susceptible of two meanings, shall be taken most strongly against him who uses them.

2. In a deed the words of description were "three hundred inches of water under a two and one-half feet head." It was shown that this was the equivalent of nine hundred and forty-eight cubic feet of water per minute if measured by the "practical inch," and upwards of one thousand five hundred cubic feet per minute if measured by the "theoretical inch." There was nothing in the context or in the contemporaneous circumstances to show whether the larger or the more restricted meaning was intended.—*Held*, that as against the grantor and those claiming

under subsequent grants from him the larger meaning would be taken as intended.

3. A grantor cannot by creating practical difficulties, after he has made a grant that is free from them, defeat a grant already made or influence its legal construction.

4. A court required by the issue to determine the legal rights of parties by construing their written grants may upon proper pleading assume the further task of laying down a practical rule for their enjoyment, but if either must give way it must be the latter, since the prime office of courts is to determine rights, not to mould them to circumstances.

Appeals from a decree of the court of chancery advised by Henry C. Pitney, advisory master, whose opinion is reported in *68 Atl. Rep. 892.*

*Mr. Wayne Dumont* and *Mr. William H. Corbin,* for the Bamford Brothers, appellants.

*Mr. William H. Morrow,* for Abram McMurtrie, appellant.

*Mr. George M. Shipman,* for Delphine McMurtrie, appellant.

*Messrs. Smith & Brady* and *Mr. John W. Harding,* for Aline E. Crane, respondent.

The opinion of the court was delivered by

GARRISON, J.

The decree brought up by these appeals undertakes to settle the respective rights of three parties in their proprietary use of a water power. The description of these rights and the history of their acquisition by the several parties are so fully stated in the opinion of the learned advisory master that without any extended restatement of the case we may proceed at once to point out the two matters in respect to which we have come to a conclusion different from that reached in the court below.

The three parties to the litigation are Crane, Bamford and McMurtrie, each of whom has by grant a property right to a certain quantity of the water that flows through an artificial raceway on the Pequest river in Warren county. These grants, which

are in effect from a common grantor, are, in point of time, first that of Bamford, then that of Crane as to one of her grants, then that of McMurtrie, and lastly, the second Crane grant.

The only questions with which we find it necessary to deal are first as to the manner in which the ascertainment of the quantity of water to which Bamford is entitled was treated in the decree, and secondly, the proper construction of the grants of Crane and McMurtrie.

The present litigation was started by the filing of a bill by Mrs. Crane, by which she claimed that she owned one-fourth of the flow of the water in the raceway, with which right she alleged that Bamford and McMurtrie had interfered by placing in the raceway an obstruction with an aperture that permitted less than one-fourth of the flow to come to her. The prayer of the bill was for the removal of this obstruction, and that the defendants be enjoined from interfering with the complainant's right. Bamford and McMurtrie, by their answers, denied the complainant's right to the proportion of the flow asserted by her, and by their cross-bills asked the court of chancery to determine the respective rights of the parties to the flow of the raceway and to decree how such flow shall be gauged so as to secure the several enjoyments thereof.

The substantial questions therefore on which the parties joined issue and went to trial were first their respective proprietary rights as grantees of the water flowing through the raceway, and secondly, how such rights when determined should be practically enjoyed by their several owners. The first question which is one of the construction of written grants admits of a conclusive judicial answer based upon the established canons of that branch of the law; the latter, which is a problem in applied physics, may or may not admit of precise solution by the judicial application of the scientific data furnished by the testimony to the practical situation; if either must give way, it must be the latter, since the prime duty of the court is to determine rights. Whether such rights when determined can be practically adjusted by the decree of the court or whether they must be left to such adjustments or compromises as the owners of such rights alone have the power to make, depends upon the nature of such rights and the facts of the

given case. Clearly the rights of the parties come first. These remarks are made, because in each of the respects in which we differ from the conclusions of the learned advisory master, it seems to us that in a juncture in which either the rights of the parties or the regulation of such rights must give way the decree gives precedence to the latter over the former.

From the decree, which was in all substantial respects favorable to the complainant, Bamford has appealed and McMurtrie has appealed. Mrs. Crane has not appealed.

Bamford's appeal challenges that part of the decree by which his right to the water flowing through the raceway is limited to nine hundred and forty-eight cubic feet per minute. The decree adjudges that this is the equivalent in cubic feet of "three hundred inches of water under a two and one-half feet head," which is the language of Bamford's grant.

It is not questioned that this is a correct result if the language quoted be construed as requiring that the flow of water thus described is to be measured by the "practical inch," which the learned advisory master explains in his opinion and applied in the decree that he advised. It appears, however, from the testimony and in the conclusions of the advisory master, that there is another mode of measuring such a flow, viz., by the "theoretical inch," which, if applied to the flow of water called for by Bamford's grant, would give him upwards of one thousand five hundred cubic inches of water per minute. Upon the assumption that the language of the grant was equally consistent with either of these modes of measurement the decree gave to Bamford the less favorable of the two. This is the adjudication that Bamford challenges by his appeal.

The reasons given by the learned advisory master for adopting the mode of measurement that he did, and for his rejection of the other mode, are set out in full in his opinion and need not be repeated here excepting as to his final conclusion in which after saying: "I shall not attempt the difficult task of deciding between these conflicting views," he announced that he would "adopt the views of the defendants' engineers." Just what was meant by this, we cannot say, but assuming that it referred to some evidence given in the cause, we have examined the testimony

of all of the witnesses called by either Bamford or McMurtrie without discovering anything that could be construed into an abandonment by Bamford of his right to have the benefit of the most favorable construction of his grant, even assuming that the witnesses in a cause can by anything they may say so affect the rights of the litigating parties. The expert testimony, it is true, afforded the practical data for the application of each mode of measurement, but did not bind the party who produced such testimony to either mode conclusively; certainly not to the mode least favorable to such party.

The chief reason, however, for not rehearsing the considerations stated in the conclusions of the court below, is that they signally fail to overcome the well-established rule that, in the construction of private grants, words equally susceptible of two meanings shall be taken most strongly against him who uses them. "It is a maxim in law that every man's grant 'shall be taken by construction of law most forcible against himself." *Co. Litt. 183a.*

The reason given for this rule in *Cruise Dig., tit. 32 ch. 20 § 13,* is:

"That the principle of self interest will make men sufficiently careful not to prejudice themselves by using words of too extensive a meaning; and all manner of deceit is hereby avoided in deeds; for men would always affect ambiguous expressions if they were afterwards at liberty to put their own construction on them."

To the same effect is *Shep. Touch. 87:*

"When a party introduces an expression having two meanings, one larger the other more limited, he cannot afterward set up the narrower construction," is the text of a note to *Elphinstone on the Interpretation of Deeds, p. 94,* which the American editor has illustrated by a large number of citations. It may be freely admitted that this rule does not apply where a different construction is made necessary by the context or where to apply it would be to work a wrong, and also that contemporaneous circumstances may lead to its rejection. In the case in hand, however, none of these conditions is present to militate against giving to this rule its full effect. There is no context to modify the

terms employed by the grantor and no wrong done by construing such terms according to legal rule; while the contemporaneous circumstances run with the rule rather than against it. The grant to Bamford's predecessor in title was the earliest made of this water power. It was presumably made to attract manufacturers, and hence liberal. It was without qualification a grant of "three hundred inches of water under a two and one-half feet head," and no mode of measurement suggestive of the practical inch was provided. In this last respect it was on its face more liberal than subsequent grants, for in subsequent grants the same grantors specified that the water granted was to be "gauged by an aperture in the raceway," which shows that they knew how to impress such narrower effect upon their grants. The practical difficulties that have arisen from the difference in the grants could not have been in the mind of the grantor when the earliest one was made, for they had not then arisen and would not have arisen but for the changed language of the later grants. A grantor cannot, however, by creating practical difficulties, after he has made a grant that is free from them, defeat the grant he has already made or introduce adverse elements to affect its legal construction. In fine whatever went out of the grantor by the Bamford grant stayed out of him, and thereby diminished his title; and those claiming thereunder can rise no higher than their grantor's rights or invoke or repel legal rules for the construction of his earlier grant that he himself could not.

Assuming, therefore, that it is possible to read Bamford's grant as if it contained the language that was inserted in the later grants and not in his—a pretty violent presumption in view of the actual language employed—and assuming also as we must, that it is also possible to reach such grant as it was written, *i. e.,* free from such narrower mode of measurement, then by force of the rule stated such grant should be given the meaning most favorable to its grantee as against the grantor or those who claim under his subsequent grants. This is the construction that we think should be given to Bamford's grant and to it the testimony taken in the cause be applied. To this end the decree upon Bamford's appeal must be reversed.

McMurtrie's appeal also turns upon a question of the construction of grants, viz., those of McMurtrie and Crane. For the proper presentation of the question involved the language of each grant must be quoted.

In the first of the two Crane grants the language pertinent to the water right was this:

"together with one hundred inches of water under a two feet head to be gauged· by an aperture to be fixed by the party of the first part at their own proper costs and expenses and to be taken out of the raceway of the party of the first part opposite the south end of the aforesaid lot; it being agreed and understood between the parties to these presents that, as between them, the whole quantity of water is to be estimated at eight hundred inches under a two feet head; and if at any time the quantity of water should be less than that amount the parties of the second part, their heirs and assigns, are to use only their proportionable share, namely, one eighth; and the parties of the second part for themselves, their heirs and assigns, covenant and agree to and with the parties of the first part, their heirs and assigns, to pay their proportional share, namely, one eighth, of all sums that may be necessary or proper for keeping up and keeping in good repair the dams and raceways, with their appurtenances, by which the water is brought down."

Next in order of time was the grant to McMurtrie, of which the following is the pertinent language:

"together with the undivided half part of two hundred inches of water under a two feet head, to be gauged by an aperture to be fixed and taken out of the raceway passing through said lot, excepting and reserving out of said lot and premises the said race which passes through said premises about twenty feet wide, and also the easement or roadway between the said race aforesaid and the front of the foundry building and between the race and the saw mill, which is located on the said premises, and also the easement and road which passes through said premises north of said saw mill, with the full understanding that said road as it now exists passing in from Hardwick street in front of said saw mill and foundry and also passing around in the rear of said saw mill and foundry and out into Hardwick street again is not to be blocked up but to be kept open for the passing of horses and wagons to pass around the buildings and said premises and for the accommodation of the adjoining premises and the public forever. And it is further understood and agreed by the parties that the whole quantity of water in the water power of the Pequest Creek is estimated at eight hundred inches of water under a two feet head, and that the undivided half part of the two hundred inches of water hereby conveyed is subject to the rights conveyed heretofore to the Belvidere Manufacturing Company, and if at any time the quantity of water in said water power should be less than eight hundred

inches of water, only the undivided half part of the two-eighths of the balance of the water, which remains after the Manufactory aforesaid has received the quantity to which she is entitled, shall be used at the said mill by virtue of this deed. And also that the said McMurtrie is to pay the half part of the two-eighths of all sums that may be necessary or proper for keeping up and in good repair the dams, banks and race way with their appurtenances by which the water is brought down into the reservoir and let out of said race way as may be determined by a majority of the owners of said water power or those who have rights therein."

Lastly is the second Crane grant, viz.:

"One undivided one half or moiety of all those two certain tracts of land, and the one undivided one half of two hundred inches of water under a two feet head, to be gauged by an aperture to be fixed and taken out of the race way through any land which the said party of the second part now owns or may acquire by this conveyance, the said water being part of the water of what is known as the upper water power in said Town of Belvidere."

Then follows a complete description of the lot of land conveyed and some reservations of rights not important in this connection.

Then follows this clause:

"And it is further understood and agreed by the parties that the whole quantity of the water power of the Pequest Creek is estimated at eight hundred inches of water under a two feet head, and that the undivided half part of the two hundred inches of water hereby conveyed is subject to the rights conveyed heretofore to the other parties who have become owners of portions of said power. And if at any time the quantity of water in said water power shall be less than eight hundred inches of water, only the undivided half part of the two-eighths of the balance of the water which remains after the Belvidere Manufacturing Company has received the quantity to which it is entitled shall be used by the party of the second part by virtue of this deed; and also that the said party of the second part is to pay the half part of two eighths of all sums that may be necessary or proper for keeping up and in good repair the dams, bank and race way with their appurtenances by which the water is brought down into the reservoir and let out of said race way as may be determined by a majority of the owners of said water power or of those that have rights therein."

In dealing with the language of these several grants the court below construed the hypothetical proviso as to the eight hundred inches of water as not confined to the particular juncture indi-

cated in the grant, viz., when the flow should be less than such estimated amount, but, on the contrary, held that such provisional estimate should be applied also to the grant of a specific number of inches of water that had already been made in express terms, thereby making the entire grant a proportional one.

We think that this was error in construction. Each grant conveyed an express number of inches of water under a specified head to be gauged through an aperture in the raceway. This was definite and concrete; the subsequent hypothetical proviso that the whole quantity of water should be understood to be eight hundred inches had relation by its context solely to the contingency with which it was coupled, viz., when the flow of the water in fact fell below eight hundred inches, and to the other object expressed, viz., as a guide to the distribution of the expenses of maintenance.

This being the clear reading of the grants, such meaning should have been given to them regardless of the convenience or inconvenience of the practical regulation of the flow of water by the decree of a court or even in view of the impracticability of such regulation.

By the construction adopted by the court below the right of the parties to have their grants construed according to law was made to give way to the feasibility of judicial regulation. This is shown by the court's own comment upon the construction it thus adopted:

"I am the more ready to adopt that construction," said the learned court, "since it avoids the great difficulty of apportioning the waters between these parties strictly in accordance with the language of the conveyances, if the defendant's construction should be adopted." We think that it was the defendant's right to have the conveyances construed strictly according to their language regardless of the difficulties of apportionment that might result therefrom. Such apportionment was a subordinate consideration; the prime office of the court was with the rights of the parties. A right judicially declared is something the parties themselves can deal with, even where courts cannot, for the party may make compromises or even concessions that a court is not authorized to make in his stead. The mere submission of

the question of practical apportionment did not vest the court with authority to give away the rights of parties or to construe the instruments by which such rights were evidenced otherwise than by legal rules. Such a submission is a mere matter of pleading, it is not tantamount to a power of attorney.

For the reasons stated we conclude that upon McMurtrie's appeal the decree should be reversed, to the end that it may be made to conform to the views herein expressed.

In the matter of costs, Mrs. Crane, inasmuch as she brought the defendants into the court of chancery, where, in our judgment, she was not entitled to a decree in her favor, should pay their costs in that court. Bamford and McMurtrie were each forced to come to this court for the correction of the decree Mrs. Crane obtained in the court of chancery. She should therefore pay the costs of these appeals, including printing; the part of the decree from which Bamford appealed was, however, favorable to McMurtrie as well as to Mrs. Crane, and he sought here to sustain it; Bamford's costs in this court, therefore, should be paid jointly, *i. e.,* equally by Mrs. Crane and McMurtrie.

The decree will be reversed and remitted to the court of chancery for such modifications and for such further proceedings, if any, as may be required by the foregoing views.

No. 9—

*For affirmance*—None.

*For reversal*—The Chief-Justice, Garrison, Swayze, Trenchard, Parker, Bergen, Voorhees, Minturn, Bogert, Vredenburgh, Dill, Congdon—12.

No. 10—

*For affirmance*—None.

*For reversal*—The Chief-Justice, Garrison, Swayze, Trenchard, Parker, Bergen, Voorhees, Minturn, Bogert, Vredenburgh, Dill, Congdon—12.

No. 11—

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, DILL, CONGDON—12.